Good morning, Your Honor. Robert Spretnak here on behalf of the Plaintiff Appellants Leanne Archuleta and Michael Dickens. I would like to reserve five minutes for my rebuttal time, if it may please the Court. We are here on a motion to dismiss that was granted on all six claims for relief pled by two plaintiffs in the District of Nevada. The primary claims are retaliation claims. And the Court had some concern that there wasn't sufficient nexus between the objection to unlawful behavior and the termination. And that nexus disconnect took two forms. First of all, everything started here in August of 2013. Let me get retaliation for what? Retaliation for opposition to sexual harassment in the sense that in the case of Leanne Archuleta, the first claim for relief, in that a high-level executive, executive vice president, chief corrections officer with defendant CCA, was on a site visit to the prison and grabbed, fondled the hand of Leanne Archuleta. Help me with that. Yes. For me, the interesting, difficult issue was it has to be for opposition to sexual harassment. Yeah. And I was trying to find her opposition. Well, she said it made her uncomfortable. Let me finish my question here. I'm sorry. As far as I can tell, he grabbed her hand to look at her ring in public. She did not complain about it to anybody.  It was in public and videotaped, I guess. And said it looked to him like sexual harassment or looked to her. I don't know the sex of the person. But the best the investigator could get out of her was that it made her, I can't remember exact words, uncomfortable and something else. Odd. Odd. And I was thinking, I see these politicians on TV all the time, and they're shaking hands with somebody. And instead of just the right hand and the shake, they put the other hand on the arm or they put the other hand around them. I hate that when people do that to me. It makes me uncomfortable and feels odd. But I still can't see that she was opposing it. In fact, what her boss disciplined her for was, as far as I could tell, for not opposing it. She was disciplined for not reporting sexual harassment. And so I'm having trouble with the opposition part of the test. Well, the ‑‑ we believe that the evidence will show it wasn't that the discipline was related to the allegation. It was an unrelated issue involving the Prison Rape Prevention Act was the discipline one week later. And then ‑‑ I'm talking about the taking the hand to look at the brain. Okay. Yeah. And I think that is protected opposition. Keep in mind ‑‑ Well, but no. Focus on where is the opposition. Okay. I was going to say, keep in mind, Leonora Choleta is the ‑‑ in a high level management position at this facility, did not want to make a big deal of this because of fear of what would happen. And, indeed, she got fired and she just recently lost her replacement job because of the fact that she filed a lawsuit against it. There's a public record. And when you look for positions at this level, if you've got a record of a lawsuit, it's extremely difficult to get work. So she did not want to have to assert herself if she could avoid it. However, she was pulled into the investigation. It's a prison, lots of videotape, lots of surveillance video there, seen by the information management person that he had grabbed the hand. And she made it clear that she did not like what was happening. Well, I don't know. When she was subject to inquiries by an investigator who was looking to see if a sexual harassment charge ought to be filed, she didn't say that she felt it was sexual in any way and she didn't say it was sexual harassment. The best he could get out of her was uncomfortable. And then her boss disciplined her for not reporting sexual harassment. I put those things together, and it looks like she did not oppose the hand to look at the ring incident as sexual harassment. And I'd like you to focus on that rather than talk about these other things and tell me why it amounts to opposition. Because she made it clear that she opposed Harley Lappin's actions that day. She was opposed to it. It made her uncomfortable. It felt odd. She was reluctant. It's the same sort of situation like a whistleblower case. Clearly, whistleblower protection protects the person who calls up the government body and says, you know, they're violating banking regulations here or something like that. But when the banking regulators show up and they start asking people and the people sort of then kind of cooperate with the investigator and say, well, you know, I don't know. It's the exact opposite of that hypothetical. In that hypothetical, the person first made a call. In this case, she did not first make the call. Instead, in this case, she gets disciplined for not making a call and not complaining about sexual harassment. Again, the record will not show that she was disciplined for not making the call. The discipline was for unrelated purposes. No, it was also disciplined for failing to report sexual harassment, as I recall. That's not in the complaint, and we're dealing with a motion to dismiss, so we're dealing with the four corners of the complaint here. So that wasn't in the complaint? No, it was not. Thank you. No, it was not. And like I said, to kind of complete my analogy with the whistleblower case, if the regulators, investigators show up and people who didn't report start saying, well, I don't know if this is a violation, but my employer did X, X, Y, and Z, then that person is also protected from retaliation, even if they're not the one who made the initial call. So making the initial call is not a requirement to get the protections under retaliation. It is making sure that you're opposing, and she opposed what the employer themselves labeled as sexual harassment, that she was uncomfortable. She felt it was odd. She didn't want to stick her neck out too far, but it still was enough that she got fired. The employer looked into it. They investigated it, but I don't know if they claimed it was. I thought it was, you know, I guess I was just assuming that the TV shows you the visual but not the words, so you see somebody taking somebody's hand, but you don't know what words were exchanged. Is that true? Yeah, the investigation was launched by the IT person who was monitoring the surveillance video, and I believe the evidence will show that he said, like, possible or potential sexual harassment. My question was, I assumed, but I don't know, that surveillance video is silent. It's a silent movie. You don't get to hear what the people are saying to each other. Is that true in this case? I don't know because I've not seen the surveillance video because we've conducted no discovery. I've seen surveillance video in some cases where I've gone against casinos, and it's silent, and casinos can afford state-of-the-art, so I presume that it's presumption. That's why I assume, too, every surveillance video I've seen was silent. Right, but the surveillance video that is seen, again, because we did not get the discovery, has not yet been produced in discovery to be able to answer that question, and that's why this case needs to go to discovery because there are unanswered questions like that that need to be fleshed out. And so she made it clear that she opposed Harley Lappin's actions, and she suffered within a week. She was disciplined, and in the complaint we say that she was disciplined for a false accusation of violating the Prison Rape Elimination Act. Well, but it sounds as though your real complaint is she was disciplined for that, but that was an excuse. That was retaliation for, so when you say... Protectual. Yeah, right. Yeah, that was protectual. And when we get to Mr. Dickens' claim for retaliation, when he said Leanne is telling the truth and supporting her and kind of not wanting her to be left out alone on this March incident that happened, his opposition was refusal to participate in a pretextual firing, and that's the protected activity that he knew, based on the history with this warden, that they were after Leanne, he correctly read it, and kind of what's showing the linkage here is the fact they were fired on the exact same day simultaneously. Assuming that we accept pretext, is what the pretext is for is retaliating against somebody for filing a workers' comp claim? That's another potential theory. And again, we pled them in the alternative because we want to see which way the evidence takes us, whether it takes us in the direction of, because the workers' comp injury occurred... It's both retaliation for opposing sexual harassment and retaliation for filing a workers' comp claim. I wouldn't say it's an and, it's an or. They're pled in the alternative because of the nature of but-for causation. We can't prevail on both. But at the pleading stage, again, we're not sure which direction. We've not seen any of the internal memos. And so that's why, I mean, my expectation is that the first two retaliation claims are the direction the evidence is going to take us. But there's enough there, given the timing with the workers' comp, that that cannot be written off. Given the history of Warden Collins with the White assistant wardens, we don't think the race discrimination can be written off. Now, before you sit down, I'd like you to address, at least briefly, the race discrimination  issue. That was dismissed on the ground that you didn't plead really with particularity. We pled with as much particularity as we could before discovery in saying that her pattern in practice is with the assistant wardens and also with Warden Collins, with the assistant, with White assistant wardens, that it's a pattern in practice in that direction. Right. And what you pled was that Martin comes to Dickens and says, hey, we'd like you to come to Nevada and work as a deputy under Collins. He says, no, I don't want to do it, because she's got this reputation for having conflicts with and then firing White deputies. And Martin comes back and says, no, I'll protect you. I guarantee you'll be fine. So he takes it. Then the complaint says he gets canned, but also that he was, quote, subjected to bullying and harassment by Collins. Now, with respect to the prior firing of the earlier deputies, are the names of those not pled, because you don't know what the names are? I don't know what they are. We just, it's one of these things where Michael Dixon's sitting in Texas working. No, no, no, that's all you need to say. But as to the bullying and harassment, he does know that because he experienced it, but you don't give me a hint as to what it is. So, and a lot of that ties into the, you know, you're playing with fire when he tries to give equitable discipline in the thing like that, kind of making it clear that she was kind of overriding his authority, that that's in kind of violation of chains of command is a very, very severe issue in prison. So that's a lot of the... of the racial discrimination that would support the racial discrimination part of your complaint. Does the bullying and harassment have a racial component with it that's somehow identifiable by the nature of that? No. No, that it's just her pattern of mistreatment of white assistant wardens saying, I didn't even want to have you hired, and then firing him within just a little over a year after he got there, kind of the first opportunity. So kind of making it clear that he was not long for that job is the kind of... is the bullying and the harassment. But I don't believe the evidence is going to show that her bullying and harassment took a particularly racial form. And your issue with Charlie Martin also brings up the NRS 613.010 claim about fraudulent misrepresentation. Let's hear from the other side so you can save a minute or two. Okay, thank you, Your Honor. Thank you. Good morning. My name is Katie Branson. I'm here on behalf of Corrections Corporation of America, or CCA. Has the firm changed its name, Corrections Corporation of America? It's also been referred to as CoreCivic. Okay. So just I'd like to address first your points, Your Honor, that you've brought up with opposing counsel. The first is whether these individuals engaged in opposition, and we're talking about both Archuleta and Dickens. Both of them are alleged to have engaged in opposition of protected activity under Title VII. Neither of them did, and it isn't pled that way in the complaint. It's not enough under Crawford that Archuleta said that given what Crawford calls an ostensibly disapproving account. In this instance, she is called in in an investigation, and the way the complaint is pled is where the problem lies. She specifically says in the complaint that she was asked if it was sexual harassment. There's no allegation in the complaint that she held a reasonable belief that she was a subject or a victim of sexual harassment, that she held a reasonable belief or somehow felt that something was done that could put our company on notice that she was a victim. And when she is expressly asked, yes, there are no magic words, but when she is expressly asked, do you feel you were a victim of sexual harassment under this case or under these circumstances, she merely said that she felt awed and uncomfortable. And, in fact, in some of the briefing, there are ‑‑ She felt awed or that it was awed? That it was awed. I apologize. I don't think she said she felt awed. You are correct, Your Honor, that it was awed and uncomfortable when he grabbed her hand. But one of the problems that we're seeing, though, in the briefing is that all of a sudden this is a groping incident. This is a fondling incident. But in the First Amendment complaint itself, which has been amended once pursuant to a roadmap given by the district court saying, here's your problems with all six of these claims. Let's fix them, get them back to me, and I'll take a look at them. That, if it indeed was groping, fondling, those hot‑button words, that should have come out in the First Amendment complaint and not just now in the appellate briefing. So at the end of the day ‑‑ No, we're looking at the complaint. I'm not looking at the briefing for a description of what's in the complaint. I look at the complaint. I get that. Understood. Now, this is a tricky one because I'm fully sort of sympathetic with someone who is the victim of either sexual harassment or sexually tinged behavior that makes someone uncomfortable. We all know that the person subjected to that is reluctant to complain. Often the complainant gets in more trouble than the person against whom the complaint is brought. And it's entirely understandable to me that she would have preferred just to let that drop. I mean, if she wants to make her way in the company, there's a higher up in the company who does something weird, slightly sexual, makes her uncomfortable. I think in her position I would have been uncomfortable. Don't make a big deal out of it. She's a 20‑year employee, never had any discipline against her before. She's clearly figured out how to work in this environment. Somebody else sees that, tries to make a big deal out of it, and she still tries to be truthful about it but doesn't want to make a big deal out of it. She says, it made me uncomfortable. It was odd. She doesn't say it was sexual harassment, but she describes, I assume accurately, her response to it. It may be for the outsiders in evaluating to decide whether it is sexual harassment. She clearly doesn't say, I really liked it. She clearly makes it pretty clear she didn't like it. Why is that not opposition? Now she's made it clear she didn't like it. Understood. And I understand the Court's concerns under these circumstances. First, my first part of that response is the complaint itself makes no allegations that she feared for her career and therefore changed her response as part of the investigation in order to save her career. And they had two instances. What do you mean changed her response? I said nothing here about changed her response. She kept her mouth shut. Somebody brings it to the attention of the authority in the prison. When asked, she says X. What did she change? In the complaint itself, she never says her answer was not consistent with how she felt because of this fear of this higher up. Her complaint says, this is what I was asked, this is how I responded. Not, this is what I was asked, and even though I felt sexually harassed, I responded a different way out of fear for my job, out of fear for an inability to move up in my career. Oh, okay. No, I'm clearly bringing that to the situation. Right. No, no, she's done one way or the other. Now what happens in the, what's alleged in the complaint is they're taking the tour of the facility with this higher up, Lappin. He behaves in this way. She says nothing to the authorities. It then shows up on the video. Somebody spots it. When questioned, she describes, I assume accurately, her reaction, which was say she didn't like it. Correct. So I don't get the change at all. She just, that's how she behaves. And I understand that. I don't intend to say that she changed her response, only that if she was hiding it at that time, now is the time in a lawsuit when you can say, I engaged in protected activity. Maybe I didn't say that I felt sexually harassed, or maybe when I was asked a direct question by the investigator if Mr. Lappin had sexually harassed me, as she pled in her complaint, that she instead downplayed it, said it made her feel odd or uncomfortable. Now is the time, this complaint, and the first amendment complaint, is the time to explain, I downplayed it because of this fear. But she does not say that. She doesn't qualify. So my response to that concern is that that concern, being glaringly devoid from both the complaint and the first amendment complaint, was not her concern. Well, but I find the behavior of Morton Collins here really difficult to understand. We have a 20-year employee of the company who has never had any disciplinary infraction registered against her in the entire time. She is asked about this. She says, I felt uncomfortable. It was odd. And a week later, gets written up for discipline. And then she's fired after an investigation. What other explanation is there for this behavior on the part of the warden? The behavior that she's disciplined? First off, the discipline and then the firing. Okay. Well, that would be an issue in this case. The first discipline was her failure to report misconduct in violation of the Prison Rape Elimination Act. And the second is for endangering her subordinates. Well, I understand that. But she's saying those complaints are baloney. I understand. I've been working here for 20 years. I know the rules. I know what I'm supposed to do. I've never been written up before. And I'm now being written up immediately after I tell you what I thought of what the superior did to me. Right. And I think it comes back to while there are some issues concerning whether or not there's causation, as far as it's played in the complaint, the bottom line is that she didn't engage in protected activity. And, in fact, if you go back to Clark County. Why isn't it protected activity when she is treated in this way that someone from the outside could have called sexual harassment? She doesn't say the magic word sexual harassment. But she makes it clear she did not welcome it. And as soon as she makes it clear she did not welcome it, and is there now out in public, she gets what she says are these phony baloney allegations and discipline, and then she gets canned. Because when you go to Clark County School District versus Breedon talks about if there is an isolated incident, without more, you have to look at it from what a reasonable person under those circumstances would feel was discriminatory or harassing conduct, and looking at a ring on someone's hand, which is how it was played in the complaint, has to be looked at from that standard. Well, it depends. I mean, if we're talking about what constitutes actionable sexual harassment, I think this isn't enough. On the other hand, if we're talking retaliation, you don't have to allege something that, in fact, is actionable. All you have to do is talk about something that could conceivably or be thought to be sexual harassment. So she doesn't have to show for purposes of retaliation that what Lappin did to her was going to give her a successful Title VII suit. The problem is the victim herself denied that it was sexual harassment. This I.T. Wait a minute. She denied that it was sexual harassment? In the complaint it says, and I'm looking at paragraph 27A of the first amended complaint. Hang on. I'm going to get there. Take me a second. Okay. 27C. I apologize. So 27A. Okay. I'm slow. I'm slow. It's okay. I'm slow. I'm slow. I'm old. I'm slow. Okay. 53. Okay. I'm on page 53, paragraph 27. What are you talking about? A, Plaintiff Archuleta was asked by the investigator if Mr. Lappin had sexually harassed her. Go to paragraph C. Plaintiff Archuleta acknowledged she had not reported the incident as sexual harassment, but that she felt, quote, uncomfortable and that the incident with Mr. Lappin was, quote, odd. Right. So, but you. No, but you said she denied that it was sexual harassment. That's not what she said. That's not what this complaint says. I interpreted paragraph C that she's acknowledging I'm not reporting this as sexual harassment. No. I'm reporting. Please read it. She acknowledged she had not reported the incident as sexual harassment. That is to say she didn't report it. She is not saying I don't regard it as sexual harassment. And I wouldn't anticipate she would say that. Well, but what you would anticipate is quite a different thing as to what's in the complaint. Correct. And also, let's look at the first claim for relief on page 57. Paragraph 45. She engaged in the following activities that were protected opposition to sex discrimination. And she writes, recites all these things. So why isn't that a foundation for at least pleading a plausible claim for sexual harassment activity for which he was then terminated because of her complaint, her opposition, it was retaliation. As Judge Fletcher said, Beecher and the other cases may not support harassment claim, but if she was interpreting her own statement about feeling uncomfortable, and that would then she had fled a complaint. You say we have to rely on the complaint. I agree with that. That's a motion to dismiss. But I'm having trouble with your argument as to why the complaint isn't enough to create a survival motion to dismiss on a retaliation claim, not a sex harassment claim. Correct. If I understand your question correctly, at this point under the complaint, a third party said, ostensibly an IT person who reviews surveillance videos said, hey, I saw him grab her hand, that's sexual harassment. The employer lodges an investigation. Yeah. And the employee is directly told, you know, hey, is this sexual harassment? Did you feel sexually harassed? While the First Amendment complaint is not clear, she specifically does say, you know, it was odd. I felt a little uncomfortable. You're putting the tone on it. The fact is we don't know how her tone was. You added the word little. You're correct. It was just uncomfortable. Correct. I apologize. Go ahead. So when you're looking at the case law, such as Clark County School District versus Breeden, what they say is when there's one incident and you're looking at this whole, at whether someone engaged in a protected act. That's not counsel relevant. Okay. As Judge Fletcher pointed out, she may lose on a sexual harassment claim. Her claim is Lappin instituted the investigation, this third party, from the video. They interviewed her for sexual harassment. She went so far as to say it made her feel uncomfortable and it was odd. The question is, does that suffice to qualify as opposition? If it did, then she has an arguable case of protected activity. Now the question is, was she retaliated against for voicing that implicit opposition? Not whether she prevails on a sexual harassment claim. Correct. And with respect to the protected activity, in order to oppose, in order to get into the opposition clause, you have to oppose behavior that is illegal under Title VII. No, you don't. Wrong.  Well, and I'm not saying that it actually, in fact, was, but there has to be something that is made illegal. Let me simplify this for you. It looks like the same thing is bothering all three of us. Suppose she claims, which she hasn't, as a hypothetical, she claims, I was sexually harassed by Lappin. He groped me by grabbing my hand and looking at my ring. And let's say every prior fact and every potential prior fact thinks that's ridiculous. It just isn't that sexual.  It's not harassment. It's just annoying behavior, like the hypothetical politician who dominates you with both arms when all you're trying to do is shake hands. If she files a complaint for sexual harassment because of this contact that was not sexual harassment, she still can't be retaliated against for filing the complaint. Correct. And that's all this case is. And I apologize. That's not what I intended to say. It doesn't have to be ultimately found to be sexual harassment or conduct that was illegal. What it comes down to is her belief, her reasonable belief, that this was conduct that was violated of Title VII, even if it's ultimately found not to be. So what I was trying to say is that under the circumstances, she's presented with this question, giving her, putting it on a silver platter, and she says, well, it made me feel odd and uncomfortable. So when you're looking at the totality, or it was odd and it made me feel uncomfortable, so when you're looking at the totality of the circumstances and you look at the timeline and you look at what was alleged as what happened on the video, that he took her hand and looked at her ring, and that someone said, hey, were you sexually harassed, or there's a sexual harassment investigation, and her response, according to the First Amendment complaint, is odd and uncomfortable, then as you look at all of that, did she truly oppose behavior? Did she have a reasonable belief that she was opposing behavior that is illegal under Title VII, whether it is or not? Was that her belief when she went into this investigation, when she participated and answered these questions? Well, she clearly expressed her opposition to the behavior. She didn't say, it was okay with me, he and I were friends. There are all kinds of things she could have said that would have sort of cleared Lappinance and said, hey, this was just fine with me. She didn't say that at all. She said, I was uncomfortable and it was odd. And she says it in a context where she knows, just we know this in the world, you start making complaints, you are asking for trouble. And she got it. So the question is whether or not her relatively mild, and I understand exactly why it was mild, but her relatively mild objections constitute opposition within the meaning of Title VII, such that the behavior that comes afterwards, I have to say, could legitimately be seen by a jury as retaliation, whether or not her initial action is enough to make that illegal retaliation. Because I'm pretty close to thinking it's enough. I mean, she made it clear she didn't like it, and she made it clear that this was in the context of an exploration as to whether or not this was sexual harassment. In the form of making appropriate and sufficient allegations at the time of the complaint, she doesn't say anything about having a reasonable belief or being in the moment that she felt. Of course, in the complaint, I'm not suggesting in the investigation, she should say this is violative of Title VII. But in the complaint, that's when you say, at the time I had a reasonable belief that I was being mistreated or mishandled or inappropriately touched, and all it says is it was an odd situation. It made me feel uncomfortable. A stranger grabbed her hand, and I understand from the judge's explanation, the double-handed handshake is uncomfortable, for example, under those circumstances. No, I get that. But in a way, this is a particularly disturbing case because if it's true that this has caused an effect, that is to say we get this investigation, she says with respect to what Mr. Lappin did, it was odd and it made me uncomfortable. If she gets disciplined for that, God help us. Right. Could I ask another question? Yes, please, please. We're taking it well over, but this is a difficult case. I understand. There's something else here that's curious. Okay. It was sort of hard to follow all this internal stuff between employers and employees as it sometimes is. There are two other lines in the complaint that made me wonder whether it's a little more complicated. One is on page 53, paragraph 27D, Warden Collins later falsely accused Plaintiff Archuleta of having an improper relationship with Mr. Lappin based on the video recording. And then on page 57, paragraph 45C, as set forth in paragraph 27B, Supra, that was a reference to the hand grabbing, Plaintiff Archuleta told the investigator that Warden Collins had mocked and ridiculed Plaintiff Archuleta because of this incident involving inappropriate and unwelcome conduct by Mr. Lappin. What it sounds like there is that her boss, the Warden Collins, was teasing her or mocking her or ridiculing her about maybe she's too tight with Lappin and too friendly with Lappin. And putting that together with the fact that Warden Collins' disciplines are after the interview with the investigator where she says that she felt uncomfortable. I can't figure out what inferences to draw from these suggestions that the warden thought that far from being made uncomfortable, the warden thought that she was too tight with Lappin. Right, Your Honor. And I agree that those allegations don't fully make sense in the grand context. But at the end of the day, the way that we read that is that that would have to do with perhaps they're trying to allege facts that would support the causation element. Here are issues that made us feel that this investigation and her participation in this investigation, therefore, resulted in her termination. And here's the intermediary facts. Warden Collins allegedly made fun of her for it, things like that. But at the end of the day, our argument is still that she did not engage in protective activity because she didn't oppose conduct that a reasonable person would believe to be violative of Title VII, grabbing one's hand and looking at their ring as it's alleged in the FAC. I would like to point out, Your Honor, quickly you asked about being disciplined for not reporting sexual harassment, and that would be paragraph 37E, which is page 56. And it does say, Warden Collins ordered Plaintiff Dickens to write up Plaintiff Archuleta, white, Caucasian, and Investigator Al Zavala, non-white, Latino, for failing to report the sexual harassment. Although Warden Collins ordered Plaintiff Dickens to write up both, defendant only charged Plaintiff Archuleta with an offense. So there is an allegation that Ms. Archuleta was written up or that Mr. Dickens was told to write up Ms. Archuleta for not reporting sexual harassment within this. It sounds as though the authorities thought this was sexual harassment. That's interesting. And I'm not – I don't see what that's – I mean, does that mean that you, the defendant, concede this was sexual harassment? As to the finding, the finding eventually, my understanding from – at least from the complaint, is that no, there wasn't that finding, but it was investigated as such because there was that complaint by the third party. I'm asking a somewhat different question. Okay. 37E that you just pointed us to, Warden Collins ordered Plaintiff Dickens – I'll write the other – to write up Plaintiff Archuleta for failing to report the sexual harassment. In other words, Warden Collins herself thought this was sexual harassment. Otherwise, there's no basis for disciplining or for failing to report. I don't think that's what it means. What I see that to mean is that at the beginning, she was asked if it was sexual harassment. She didn't report it. And in her investigation, she didn't say it was. But, again, at the end of the day, it's very convoluted. No, no, I'm making quite a different point. Okay. This allegation is that Warden Collins wants Plaintiff Archuleta to report it as sexual harassment, and she's been disciplined because she doesn't report it as sexual harassment, which suggests that the warden views it as sexual harassment. Or that the warden wants to get Lapan in trouble. Perhaps. To be honest, I'm not sure how this even connects to the rest in terms of there is no finding alleged that there was. I don't know much about prisons. Make this clear to me. I was assuming that Archuleta is pretty high up, but the warden, Collins, is her boss, and that Lapan is higher up and he's Warden Collins' boss. That's my understanding, that he's more of a regional director, that he comes in from the outside. He's her boss. So she might read this subparagraph E as meaning, I wanted you to get Lapan, my boss, in trouble, and you didn't. Is that what it says? At the end of the day, it's very confusing because even the alleged adverse action and disciplinary actions that are referenced as problematic throughout the First Amendment complaint don't include a write-up for failure to report sexual harassment. So I'm not even sure that plaintiff considers this write-up an issue. And, frankly, it's hard to draw an inference from that paragraph. I've got an off-the-wall question. Is Warden Collins still employed by this organization? Yes, Your Honor. Is she still the warden of this prison, do you know? My understanding is that she is actually incredibly good at her job and has moved around to different prisons to help. Yeah, she sounds just wonderful. I know. It's the beauty of complaints. Well, let me ask you about the question that I asked toward the end of the argument on the other side, and that is with respect to Dickens, Dickens who says, I don't want to come because she has a reputation of firing white deputies. Now, that was dismissed basically under Rule 8, that there's insufficient pleading. If it could be shown a pattern, I'm now making this up, I understand. of four white deputies in a row who are fired by her after fairly short tenures, and two out of the three, before we get to Dickens, who's the fourth, if deposed will say, well, yeah, and I'll tell you, she told me to fight my case. I hate white guys working under me as deputies. Now, I'm making that, totally making that up. I understand. Is that enough for him to show and get to the jury with a race discrimination claim? With the race discrimination claim or the NRS 613-010? The race discrimination claim. Race discrimination. I think what's missing are the allegations. I certainly see where you're going with a hypothetical. What if he can show that there are these assistant wardens who are also white, and they were fired, and they can show race discrimination? I think what the court's issue was, there was a conclusion drawn with no facts that race discrimination had occurred before Dickens arrived. Period. Race discrimination occurred before Dickens arrived. Therefore, the similarly situated issue is addressed by saying, because it already happened, clearly it's happening to me now. And I think what the court's concern was that there was no factual allegations, even minorly, saying where did you come to the conclusion that she had this habit, or can you give me something to say that there was this habit sufficient to support this? I'm wondering if it's enough to get to discovery, get past the 12B6. I mean, I would think that if he could find out on discovery that she never said a word about race, but she fired four white guys in a row, and she didn't fire non-white guys, and it's hard to see any justification for the firing she made, whether that might be enough so that a jury would be allowed to draw an inference. I don't believe so, because what if there were only white men hired into the assistant warden position? Then, I mean, I'm not. Additional fact that would offset that possible inference. But what if there were plenty of non-white guys and she didn't fire them, but a white guy comes to work for her, he's canned within a short time? At the end of the day, it should have been fled. If Mr. Dickens, in fact, knows enough to do it. It's 12B6, so he probably doesn't know yet. And this isn't a securities case where you need a snitch and you have to know the facts and plead the facts right from the outset. If he knew enough to say that this was happening, then he knew enough to explain where he got that information. At least one minor bit. And it goes also to the bullying and harassment. Even if he could fix that and say, or even if this court allowed it to go, that there are all these white guys assistant wardens. What I'm thinking about is in hiring and employment discrimination cases, it's not uncommon to draw inferences just from numbers. Nobody ever says a word, but all the people of one or another ethnicity don't get promoted or get fired. Right. No, I understand that, but I think this claim would still have to fail at a minimum on the bullying and harassment. If he truly was bullied and harassed, how is he treated in a discriminatory nature? And there's not one fact to say other than he was fired. I think I agree with that. And I would, kind of along the lines of Judge Kleinfeld's questions, with respect to the prior guys, white guys who were fired, I'm assuming that there are some based on what I see here in the complaint. At this point, he doesn't know. I mean, he's heard from Martin. The reputation is out. The word is out. And it's very clear. He says, I'm not going there because it's dangerous. Martin talks him out of it and says, I'll protect you. I guarantee nothing's going to happen. Martin turns out to be wrong. But it's very clear that he had enough basis on which to say, this is dangerous territory. I'm not going there. He knew that much, but he didn't know who these other guys are. Now, with respect to bullying and harassment that he has himself experienced, he's in a very different situation. It happened to him. He knows it. And he didn't plead sort of racially discriminatory statements or whatever. And I gather that's not really part of the racially discriminatory claim. At least that's what I heard on the other side. And on that one, I think we reasonably could expect a little more particularity in the complaint if that's the basis for it. Well, and he says in his 613-010 false statement claim that the regional director told him, hey, we've got some issues going on here. These are what we see that they are, but we'd still like you to come. So that's actually the opposite of what he pleads is that he was fraudulently induced to come by someone who told him these other issues. I'm not talking about the fraudulent inducement claim. I'm just talking about the evidence that we have that would support in the complaint, the allegations that would support a claim for race-based discrimination in the termination. But where I was going with that is in that claim he says that this director told him that white assistant wardens were being fired by Miss Collins, or by Warden Collins, and that was something that they were working on, including this alleged racial animus, et cetera. So tell me where you are in the complaint with that. I am on the NRS 613-010 claim where he talks about. Yeah, what page are we? That is page 63 of the record, please. Okay. And what paragraph are we looking at? It was 74. And it says, Regional Director Martin again approached Plaintiff Dickens about taking the position of assistant warden. Regional Director Martin advised Plaintiff Dickens that there were serious, quote-unquote, racial problems. These racial problems were in addition to Warden Collins' pattern of having great difficulty working with assistant wardens. Yeah. So if this regional director is telling him this and he wants to use that information to support his race discrimination claim, what exactly did this director say? If you're looking to move, ask a few questions, right? Well, we just heard what he said. Right. In support of some fraudulent claim. But on the other hand, he. . . You omitted the next sentence. And that was not intentional. These racial problems were in addition to Warden Collins' pattern of having great difficulty working with assistant wardens and other upper-level management employees who were white, Caucasian. So my point being, if we have this conversation that allegedly took place where he learned this information, where is that information so that we as the employer are on notice of what. . . I've gone so far over the time limit in asking you questions, is that it's a 12B6. Right. Usually you have a whole lot more to work with. And for that matter, the plaintiff has a lot more to work with in pointing at facts because there's been an opportunity for discovery. But here it's 12B6. So, yeah, at the 12B6 stage, a guy hears things. Another guy hears things. They don't know what's true. They don't know the extent. If it really is true, then the warden might have figured out how to behave as though she's being tape recorded all the time so she never mentions race, but she sure acts on it. Who knows? It's kind of early in the day at a 12B6 stage. I understand, Your Honor. And I think at that level, the underlying district court judge looked at the first complaint, laid out a road map and said, this is what's wrong. This is why I don't believe that you can sustain a complaint at this level under Iqbal Twombly and 12B6. Let me tell you how to fix it. Well, you know, Iqbal Twombly focuses on plausibility, and that really is pretty central. And it is plausible that a warden would have trouble with her boss, want one of her subordinates to make trouble for her boss so she can get rid of her boss, that the boss is already having concerns about her because she's firing all the white boys and she's getting into racial problems involving inmates and staff. That's what the boss or that's what this regional director says. And who knows how it's going to develop in discovery. This may all be total nonsense, and it may all have a basis. I think that's our position is that it is. But I understand we're at the 12B6 stage. We believe that the court did give them the opportunity to fix things that would have been relatively straightforward and simple to fix, and it wasn't done. If they knew the facts. And I don't think that they had enough facts to support a claim if there were those facts that existed. I don't think the court was saying, let me have all your evidence, let me have all your issues. It was, you are making conclusory allegations of these elements, and I'm not going to allow that. You have to give me something. And they didn't, and she said that's not enough. Okay, thank you. Thank you. We've taken up quite a bit of your time. Thank you for your time. Response. Very briefly on rebuttal. So, I mean, all allegations that you want a conclusion to be drawn from are, in essence, conclusory allegations. I mean, we hear a lot of talk about what inference is to be drawn. Inference is being drawn is not the point of a 12B6 motion. That's the rule of jury. So we even pass the summary judgment. Now, I've been given a really good road map as far as what needs to be produced on an opposition to a motion for summary judgment that always gets filed in employment cases. I've got an excellent road map with that, but we need to have some discovery to flesh these issues out, because some of them are legitimately confusing to me, and I don't know what it means. We've not deposed Warden Collins to find out what her thoughts are. I know what she's going to say. Who, me? Huh? Well, let's see how she says it, then, and how credible it is. And, you know, there's things about the sexual harassment allegations. We know that that was said to Dickens, but that wasn't necessarily known to Ms. Archuletas. That's kind of one of the difficulties with two plaintiffs, is that it's kind of unclear which goes to which. But we do know for certain CCA was treating this as a sexual harassment issue, because they acted like that. Leanne Archuleta was mocked by Warden Collins. She was told she was having an inappropriate relationship. It was reported by the IT manager that it was sexual harassment. Michael Dickens is saying that he was directed to write her up, and Alzavala, who, incidentally, never actually got the write-up that Mr. Dickens was told to do. So CCA was treating this like sexual harassment. They were treating Leanne Archuleta like she reported sexual harassment, and then she lost her job, she lost her career. So that's a reasonable inference that can be drawn. The guy who ran the video reported it as sexual harassment. Correct. He's the person who reported it as sexual harassment. And then Warden Collins asks that Archuleta be written up for failing to report sexual harassment. To Michael Dickens. But that doesn't get transmitted, the failure to report to Leanne Archuleta. I don't have that actual write-up to know what the substance was. Right. But what I'm saying is that Warden Collins herself characterizes it as sexual harassment and asks that Archuleta be written up for failing to report it as sexual harassment. To Mr. Dickens. Yes. Tells Dickens. Correct. Discipline her. But what I'm after is not whether it was at the moment telling Dickens or not, but that the Warden herself characterized it as sexual harassment. Yes. And like the race discrimination claim, Charlie Martin is the one that brings up the issue that there's this pattern of race discrimination. That's clear in there. Thank you. Thank you, Your Honor. Sorry for taking you so much over time. And, Ms. Branson, in particular, we made you earn your money today. Nice job. Okay. Thank you. Archuleta and Dickens v. Corrections Corporation of America submitted for decision.
judges: Kleinfeld, W. Fletcher, Fisher